DR. C. J. STYBR *et als. v.* CAFLISCH LUMBER COMPANY *et als.*

(No. 6882)

Submitted March 18, 1931. Decided April 7, 1931. (Rehearing denied June 9, 1931.)

338

*Melvin C. Snyder* and *J. V. Gibson,* and *Moreland & Guy,* for appellants.

*F. E. Parrack* and *Thomas Watson,* for appellees.

LIVELY, JUDGE:

The chancellor refused to dissolve a temporary injunction restraining defendants from cutting and removing timber from a tract of land, and they appeal.

The motion to dissolve was heard upon bill and exhibits, answers and exhibits, and ex parte affidavits; and it, therefore, becomes necessary to set out at tedious length, and analyze, these pleadings and affidavits. Defendant, Caflisch Lumber Company, on the one side, and plaintiffs, C. J. Stybr and Thomas Watson on the other, claim title to the timber involved. Caflisch Lumber Company (hereinafter called "Caflisch") claims ownership in this way: "Salisbury Coal & Lumber Company (hereinafter called "Salisbury") in the year 1911 owned the land and timber thereon, known as the Musser tract, containing about 650 acres, and on April 21st of that year deeded the timber thereon to Jacob L. and Samuel A. Kendall, the purchase price therefor being $13,-333.33, with the right to enter on the land, cut and remove the timber at any time within 12 years from the date of the deed, upon condition that all rights of the Kendalls should cease and terminate within 12 years from the date of the deed, and all timber standing on the land at the expiration of that period should revert to and become the property of Salisbury. On November 18, 1915, the Kendalls conveyed the timber and timber rights to Kendall Lumber Company, a corporation. No timber had been cut at the expiration of the 12-year period in which it could be cut and removed; and on the day after it had expired, another agreement in

writing, bearing date April 22, 1923, was executed by and between Salisbury and Kendall Lumber Company, reciting the sale made by Salisbury to the Kendalls on April 21, 1911, the expiration of the 12-year period, the reversion of the timber to Salisbury, and that the parties had agreed to an extension of the time for removal for another 12-year period, the consideration therefor being that, beginning on April 21, 1923, Kendall Lumber Company would pay a yearly lease or rental of $1,000 for each and every year the land was occupied, payments to be made on April 21st previous to the occupation for that year, and failure to so pay on that date would be considered a forfeit of the privilege to further occupancy of the land, and all timber standing or lying on the tract would revert. Yearly payments of this $1,000 were made according to this agreement until 1926, when Kendall Lumber Company tendered in payment its 60-day $1,000 note. Salisbury declined to accept the note and demanded strict compliance, and about May 4, 1926, Kendall paid the $1,000. The 1927 payment was promptly made. The 1928 payment was not paid promptly, but on May 23rd of that year a creditor of Kendall Lumber Company (Evans Manor Land Company) sent in its check for $1,000 to continue the agreement for another year, and this check was accepted. The 1929 payment was not made, demand was promptly made upon penalty of cancellation of the agreement (forfeiture), but it was not forthcoming. Then, on August 23, 1929, Salisbury sold and deeded the timber to Caflisch, retaining a vendor's lien to secure unpaid purchase money. On September 12th, following, Evans Manor Land Company forwarded its check for $1,000 to Salisbury for the stated purpose of continuing the right of Kendall to April 1, 1930. The check was returned promptly with the information, previously given, that the timber had been sold to Caflisch, who, shortly after getting its deed, entered and began cutting timber; and this suit was instituted to March Rules, 1930, the decree refusing to dissolve the temporary injunction being entered July 28, 1930.

Plaintiffs Stybr and Watson claim title to the timber as follows: On March 10, 1927, Kendall Lumber Company con-

veyed to a trustee the legal title to all its property, including its timber rights on the Musser tract, to secure bonds which were acquired by Evans Manor Land Company or persons interested therein, including Stybr and Watson and defendant Weiler. Kendall Lumber Company became embarrassed by judgments against it, and in June, 1928, a general creditors' suit was begun against it by Rowlesburg Grocery Company, which ran its course, being referred to a master commissioner for report of assets, debts and priorities. The master's report was confirmed September 29, 1930, and a decree for sale entered. The master commissioner reported that the timber on the Musser tract (except locust) was owned by Kendall Lumber Company with the right to remove the same for a period of 12 years from November 18, 1915 (the date of the deed from the Kendalls to Kendall Lumber Company noted in the master's report), and the decree of sale uses the same language. Sale of all the property of the Kendall Lumber Company (including its right to the timber) was made on October 19, 1929, by special commissioner, and plaintiffs Stybr and Watson became the purchasers; the sale was confirmed, and deed made to them on November 4, 1929, using the same language of the decree as to the ownership of the timber on the Musser tract. Plaintiff Watson, at the time of the commissioner's sale and taking of the deed, knew that Salisbury had previously sold the timber, for it was Watson who sent the Evans Manor Land Company check to Salisbury on September 12, 1929, which was returned to him with information that Salisbury had then sold the timber to Caflisch. Under this purchase at judicial sale, plaintiffs Stybr and Watson claim superior right to the timber, and with their bill offered to pay into court $1,000 to meet the requirement of yearly payment under the agreement of April 22, 1923, between Salisbury and Kendall Lumber Company.

Plaintiffs' bill avers the original ownership of the land and timber in Salisbury; the deed made to the timber by it to Kendalls in 1911; the deed from Kendalls to Kendall Lumber Company in 1915, and the agreement between Salisbury and Kendall Lumber Company of April 22, 1923, and the terms thereof. The bill avers that Salisbury became de-

linquent in payment of its charter tax to the state and suit to forfeit its charter for that reason was begun by the state in 1928; that thereupon the corporation, by resolution of all of its stockholders, conveyed all its property to Barchus, trustee, on April 26, 1928; that it then paid its delinquent charter tax and was restored to all its corporate rights; that thereafter, on October 16, 1928, the corporation and Barchus, trustee, and in his own right, and certain individuals deeded the Musser land to West Virginia Power & Transmission Company, reserving therefrom ''the rents, issues and profits arising from the agreement of April 21, 1923, together with the right to cut and remove said timber, but only to the date of the expiration of said agreement, viz., to April 21, 1935, upon and after which date all rights of the said parties of the first part in and to said timber and timber agreements shall cease and determine and shall thereafter belong to the party of the second part hereto.'' The bill further sets up the deed of trust by Kendall Lumber Company to secure certain bonds; the financial stress of the Lumber Company in 1928, and the institution of the creditors' suit by Rowlesburg Grocery Company at July Rules, 1928; the debts owing by Kendall Lumber Company to Evans Manor Land Company and Weiler, and the ownership of the bonds secured by said deed of trust held by Evans Manor Land Company as collateral security; the report of the master commissioner in that suit, the confirmation and sale; and the deed to plaintiffs. It is charged that the court in this suit adjudicated that Kendall Lumber Company owned the timber in controversy here. It is further charged, that although Caflisch was not a party to the creditors' suit, it appeared therein and proved a claim it had before the master commissioner, and was bound by all of the decrees and orders entered therein. The bill further charges, on information, that Salisbury and Caflisch have conspired together to defraud plaintiffs and secure the timber for Caflisch or some other person. The bill prays for an injunction against any interference with plaintiffs' title, use or enjoyment of the timber; that they be decreed to have title thereto; that Caflisch be required to account for the timber already cut by it; that defendants Salibury and

Barchus, trustee, be required to disclose the contents of the agreement with Kendall Lumber Company of April 22, 1923, and to file a copy thereof with their answers; and for general relief.

Defendant Salisbury and the various individuals interested in that corporation admit the execution of the various deeds set up in the bill, and exhibit a copy of the agreement of April 22, 1923, between Salisbury and Kendall Lumber Company by which they claim that said Lumber Company only had a right to continue to cut timber on the land upon condition precedent of paying $1,000 in advance on the 21st day of April of any year, and that upon failure of that condition their rights therein ceased, and the timber standing or cut but not removed reverted. They set up the fact that on May 25, 1929, Barchus, trustee, reconveyed to Salisbury all of the properties and estates which it had conveyed to him as trustee in the deed of April 26, 1928. They deny that the deed made by Barchus, trustee, to West Virginia Power & Transmission Company on October 16, 1928, conveyed all their interests whatsoever in the timber, but aver that they reserve therefrom the right to cut that timber until the 21st of April, 1935, and that only such timber as then remained thereon passed under that deed. They deny that the trustee in Kendall Lumber Company deed of March 10, 1927, securing bonds, took title to the timber in controversy; or that the proceedings in the creditors' suit, culminating in decree of sale, conveyed the title to said timber, reference in all the proceedings relative thereto being to the papers under which Kendall Lumber Company had a right to cut timber. They aver that plaintiff, Thomas Watson, was vice-president and secretary of the Evans Land Company, and that he knew that Salisbury had sold that timber when he bid at the sale, and that the deed from the commissioner to plaintiffs show on its face that all right of Kendall to remove the timber had expired at the time of their purchase. They deny any fraud, collusion, or agreement with Caflisch or any other person to defraud plaintiffs. They deny any statement or implication in the bill to that effect; and deny all allegations in the bill not specifically admitted to be true. Caflisch, in its answer,

denied any collusion with Salisbury, set out what was done between them in its purchase of the timber, and set out that plaintiffs were fully aware of the failure of Kendall Lumber Company to preserve its right to cut the timber and of the terms of the agreement affecting that right, and that they purchased at the judicial sale well knowing that Kendall had no claim whatever to that timber and that the court could not warrant title thereto. It admits that it had a judgment against Kendall Lumber Company and set it up in the creditors' suit, and knew in a general way of the proceedings in that suit. It says that plaintiffs were fully advised of its purchase of the timber and of its intention to cut and remove the same, and that with plaintiffs' knowledge it went upon the land, some time after it had advised plaintiffs and their counsel of its intention so to do, and, without objection on their part, proceeded to lay railroads and build lumber camps at great cost, and has expended great sums of money in logging and cutting, while plaintiffs sat by without protest, and that they are now estopped to deny plaintiffs' title and are not entitled to injunctive relief.

While there appears to be no replication to this answer or the answer of Salisbury, an affidavit of Thomas Watson, vice-president and secretary of Evans Manor Land Company, is filed in which he says that after said Land Company had been advised of the default of Kendall Lumber Company in the payment of the $1,000 to Salisbury due on April 21, 1929, it sent its check for $1,000 to Salisbury in payment on September 11, 1929, which was returned to it with the statement that the property had been *forfeited* to Salisbury and that Salisbury had subsequently sold the timber to Caflisch; that thereupon Stybr and Weiler (another creditor of Kendall Lumber Company) met Caflisch and protested against the purchase and advised that they would contest its purchase and title, and notified it not to cut the timber or build railroads or mills on the land.

J. L. and S. A. Kendall, officers of Kendall Lumber Company, by affidavits, detailed their transactions with Salisbury in the purchase of the timber, and say that they did not cut any of it within the time limit of 12 years from April 21,

1911, and that after their right to the timber expired they asked for and were accorded an extension of time to cut and remove, and that they entered into the written agreement dated April 22, 1923. They admit that their failure to pay the $1,000 on April 21, 1929, forfeited their interest in the timber, and that of any of their creditors. Watson's affidavit filed for plaintiffs in addition to controverting the facts on which estoppel is set up against them in Caflisch's answer (above set out) exhibits letters between Evans Manor Land Company and Moreland & Guy, attorneys for Kendall Lumber Company, written in 1928 and up to March 15, 1929, showing that Evans Manor Land Company was paying laborers' and mechanic's liens against the Kendall property in order to protect its interests as a creditor of Kendall; that it had actually paid some of those liens and the costs connected therewith; that it was not advised of the default of Kendall in payment of the $1,000 due Salisbury on April 21, 1929, and if demand had been made on it for payment it would have responded, as it had previously done in 1928.

The trial chancellor concluded that Salisbury's deed to Kendalls in 1911 conveyed title to the timber in fee with a reverter clause of standing timber if not cut in 12 years from date which fee was perfected by payment of the remainder of purchase money in 1915; that the extension agreement of April 22, 1923, was an extension of time in which to remove the timber under the original purchase, and the forfeiture carried in that agreement became effective on failure to pay $1,000 rental in advance each year of occupancy; that this forfeiture was twice waived, once in 1926 and once in 1928; that both Salisbury and Caflisch knew of the pendency of the creditors' suit, the latter being a party thereto, in which suit title to the timber was decreed to be in Kendall Lumber Company; that Caflisch was not an innocent purchaser (knowing of the creditors' suit), and that both defendants refused to divulge the date of the sale between them and had declined to produce the deed; that Salisbury had received the purchase price of the timber $13,333.33 and an additional sum of $6,000 in "rentals", with future "rentals" secured; and that it would be inequitable to allow it to take

back the timber and sell it to the detriment of the Lumber Company's creditors, who were standing by ready to pay the rentals; and that the renewal agreement had for its object only the payment of rentals of $1,000 per year in addition to the original purchase price. The basis of the court's holding is that under these facts, and inasmuch as Salisbury had received the full purchase price of $13,333.33 from Kendalls and in addition thereto a ''rental'' of $6,000, it would be inequitable to permit it to take back the timber and sell it to Caflisch to the exclusion of Kendall's creditors, who were willing to carry out the April 22, 1923, agreement; that Salisbury is getting too much money out of its timber contract. Such is the substance of the basis for the interference of equity. These points and reasonings are much elaborated by plaintiffs' brief and oral and written arguments. In addition thereto it is pointed out that Salisbury had also received at least $6,000 paid by Caflisch when the latter purchased the timber on August 23, 1929, with general warranty of title and vendor's lien to secure the payment of three notes aggregating $13,500, all payable within three months from date of purchase.

It appears that neither the Kendalls nor Kendall Lumber Company nor any other person ever cut any of the timber, until Caflisch took possession and began to cut under its purchase of August 23, 1929. The amount Salisbury received for this virgin timber in 1929 is of little consequence if it had the right to sell. It will be noted that if any of this timber was left standing April 21, 1935, it became the property of West Virginia Transmission & Power Company. It will also be noted that under the agreement of 1923 Kendall had no right to occupy the land unless payment for that privilege was made in advance; then upon payment it could occupy the land for one year and cut all or little of the timber. By payment for one year's privilege, it could have taken all of the timber that year, but if any remained thereon at the end of the year either standing or cut and not removed, all that timber *reverted* to Salisbury and become its property, unless the privilege was kept alivé. The twelve-year term continued only so long as these yearly payments were made in

advance.   Kendall Lumber Company prefaced its agreement.
by acknowledging that its title to the timber under its deed.
of 1915 had reverted.   That deed from the Kendalls gave it
the right "to have and to hold the said timber, * * * to--
gether with all the rights, easements and privileges, subject.
to all of the limitations, terms and conditions particularly
set forth in the said deed from Salisbury Coal & Lumber Com-
nous, was not a continuation or confirmance of Kendall's.
(Deed 1911).   The agreement of 1923, which is not ambig-
uous, was not a continuation or confirmation of Kendall's.
title to the timber, but gave it the right to cut and remove·
the same in one or more years, not exceeding twelve, upon
*condition precedent* of paying $1,000 in advance for that.
right or privilege.   The sale after failure to perform the
condition precedent was a declaration of cessation of right.
*Hukill v. Guffey,* 37 W. Va. 425.   We do not think Salisbury·
waived its right to a prompt fulfillment of this agreement for·
the remainder of the 12 years by accepting payment of the·
delinquency in the year 1928 from a creditor of Kendall
who said check was to pay "royalties or rentals" from April
1, 1928, to April 1, 1929.   This creditor evidently then knew·
of the 1923 agreement, and so far as the present record shows,
voluntarily made the payment on May 23, 1928.   Nor was it
the duty of Salisbury to notify the creditors of Kendall of
the latter's failure to pay.   If the creditor desired to pre-
serve the right of its debtor to cut the timber, knowing of the·
agreement, it was its duty to be on the alert and prevent a.
cessation of the right.   It did not act until September 12,
1929, when it attempted to save the cessation of that right and.
was informed that the timber had then been sold to Caflisch,
both before and after it had forwarded its check for that;
purpose.   We do not think it reasonable to hold that Salis-
bury waived its right to a fulfilment of the agreement, for it
must be remembered that this timber if not cut and removed
before 1935 became the property of the Transmission & Power·
Company, and nothing had been done since 1911, which in-
dicated that the timber would be cut at all.

We are not impressed with plaintiffs' claim of clear title to.
the timber under the special commissioner's deed.   That deed.

conveyed all the timber, except locust, on the 650-acre tract conveyed to Kendall Lumber Company by the Kendalls by deed of November 18, 1915, giving book and page of recordation, "with the right to remove said timber for a period of twelve years after the date of said deed." That time had expired when plaintiffs purchased at the sale. The court could not sell what the debtor did not have. The decree on its face is ambiguous. The construction and meaning of a decree may be determined by looking to bill, answer and other proceedings, particularly where these are referred to in the decree itself. *Walker* v. *Page,* 21 Grat. 636; *Burging* v. *Mc-Dowell,* 30 Grat. 236, 242; and *Norvell* v. *Lessueur,* 33 Grat. 222, 227. Looking to the bill in the creditors' suit, we find it averred that Kendall Lumber Company owned the *land* conveyed by J. L. Kendall by deed of November 18, 1915, containing 650 acres in fee, called the Jacob Musser lands. The commissioner's report, the decree of sale, and the special commissioner's deed contain the language heretofore set out. It is argued that there are other parts of the record in the creditors' suit which should be considered, but they are not in this record. We cannot give the decree a wider scope or meaning beyond that which appears on its face; and the record now before us on which it is based does not enlarge it. Moreover, it appears that plaintiff Watson (who appears to be closely affiliated with Evans Manor Land Company) had actual knowledge at the time of the judicial sale that the timber had been sold to Caflisch. He must have known that Salisbury was not a party to the creditors' suit, and that any decree entered therein would not divest it of its title to the timber, if it had any therein. There can be little question that under the deed of 1911, Kendall's title to the timber reverted to and became the property of the grantor upon failure to cut and remove it within 12 years from that date. Such is the provision of the deed. The 1923 agreement declares and recognizes this so-called "forfeiture." Kendalls or their vendee, the Lumber Company, if then in possession could have been ejected. *Sands* v. *Holbert,* 93 W. Va. 574.

We have been somewhat impressed with the contention that it would be inequitable to permit Salisbury to retain the pur-

chase money of $13,333.33 received from the Kendalls, the $5,000, or perhaps more, received under the agreement of April 22, 1923, and then received in addition thereto, the cash payment on the sale to Caflisch of about $6,000, and the balance of about $13,000 secured by vendor's lien, all to the exclusion of Kendall's creditors, who, although claiming title under the judicial sale, are willing to pay $1,000 to keep the contract of 1923 alive for one year. But equity does not make contracts for litigants, nor change the terms of a contract. There is a broad liberty in the making of contracts, and where a contract is entered into fairly, though the terms thereof are harsh, equity will not generally interfere so as to deprive one of the parties of the benefits thereunder. *Watzman* v. *Unatin*, 101 W. Va. 41.

It must be understood that we are not passing upon the merits, for the cause has not been fully developed. We are here considering the cause upon an interlocutory order, and the question before us is whether the court erred in refusing to dissolve the temporary injunction.

The bill and answers are verified by oath. On a motion to dissolve an injunction, the answer is taken as true so far as responsive to the material allegations of the bill, and meets complainant's equities without evasion. *Webster* v. *Crouch*, 6 Rand. 519. There is no allegation in the bill that complainants will be irreparably damaged, nor does it allege insolvency or financial inability of any of defendants to respond to decretal money judgment. But where plaintiff has clear legal title (not here shown) injunction would lie to restrain a trespass upon lands (*Pardee* v. *Camden Lumber Company*, 70 W. Va. 68), without alleging insolvency of the trespasser.

Injunction is one of the harsh remedies, and it is quite generally held that upon bill, answer and affidavits supporting the allegations of the bill, the injunction will be dissolved, if the answer, sworn to, fully, fairly, plainly and positively denies the material allegations of the bill. *Wise* v. *Lamb*, 9 Grat. 294; *Arbuckle* v. *McClanahan*, 6 W. Va. 101; *Schoonover* v. *Bright*, 24 W. Va. 698. Subsequent decisions of this Court to the same effect are numerous.

The cause as now developed calls for a dissolution of the injunction and it will be so ordered here and the cause remanded for further proceedings.

*Reversed; injunction dissolved; cause remanded.*